## The State of Maryland *vs.* The President and Directors of the Bank of Maryland, and Ellicott, Morris, and Gill, Trustees.

A debtor in failing circumstances may prefer one creditor to another by a transfer of his property made in *good faith;* nor is there any objection under similar circumstances to the validity of a transfer by a debtor of his whole estate to trustees for the equal benefit of all his creditors.

The principle is the same whether the deed of transfer is made by a corporation or an individual.

A *bona fide* assignment of property by an insolvent individual to a trustee for the benefit of his fair creditors, is a valid sale and transfer of the property for a valuable consideration; a like transaction by an insolvent corporation in relation to the property subject to its debts, is equally a good sale and transfer of it.

A corporation not being a person capable of taking the benefit of the insolvent laws of this State, is not affected by the act of 1812, *ch.* 77, *sec.* 1; and 1816, *ch.* 221, *sec.* 6.

The rights conferred by the act of 1650, *ch.* 28, were granted to the lord proprietary of *Maryland*, personally, and to his heirs, so long only as they should be lords proprietaries of the then province; that act was not in force at the period of the revolution, and the privileges which it originally created did not pass to the State.

The royal prerogative right of preference in the payment of debts is a branch of the common law of *England*, and that common law has been adopted in this State by the general terms of the declaration of rights, and the third article thereof.  And this secures to the State the right at common . law to have its debt first paid out of the property of its debtor, *remaining in his hands, and no lien standing in the way.*

The right of priority of the State is a rule *only* in the distribution of the property of the debtor, requiring the debt due to the State to be first paid, where the individual creditor has no antecedent lien overreaching it.

The State of *Maryland's* funds were deposited in a bank under resolution of the General Assembly, and the bank being in failing circumstances, the president and directors thereof transferred all its property to trustees for the equal benefit of all its creditors.  HELD, that the assignment was valid, and that the preference which the State had in the payment of her claim so long as the title to the property remained in the bank was defeated by the deed of trust.

An executor or administrator takes the funds of the deceased to be distributed according to law, subject to such preference as the law allows.   The moment the debtor dies the law asserts the rights of the creditors, and takes the property into its hands, and makes or directs the distribution of it according to their priority; that being the law of deceased person's estates which a testator cannot by his will defeat.

A banking corporation although it may by a transfer of all its property render itself powerless to discharge the ordinary purposes of its institution, yet still remains a living and existing corporation.

APPEAL from the equity side of *Baltimore* county court. On the 3d of October, 1834, the *State of Maryland* filed a bill on the equity side of *Baltimore* county court, against the appellees, *the President and Directors of the Bank of Maryland*, and *Thomas Ellicott, John B. Morris, and Richard W. Gill*, trustees ; claiming to be paid out of certain funds in the hands of the trustees, in preference to the other creditors of the bank, which was charged and admitted to be insolvent.

The bill alleged, that the *Treasurer of the Western Shore* on the 1st of October, 1832, in pursuance of a resolution of the *General Assembly*, passed on the 14th of March, 1828, deposited of the public monies, in the *Bank of Maryland*, the sum of $50,089 96, for which, with interest at the rate of *five per cent. per annum*, the interest payable quarterly, and the principal on demand, he received a certificate of deposite signed by the president and cashier thereof. That afterwards, on the 22d of March, 1834, the said bank became insolvent and unable to pay its debts, and being so insolvent, on the day after (the twenty-third of March) conveyed and transferred to *Thomas Ellicott,* all its estate, property, funds, rights and credits. That on the 26th of March of the same year, the said bank executed a similar deed to the said *Ellicott;* and afterwards on the 5th of April of the same year, the *Bank*, and *Ellicott,* conveyed and transferred to *Ellicott, Morris,* and *Gill,* all the said property, funds, rights, and credits. That they accepted the trust, and in virtue thereof, have received large sums of money, which they now hold for equal distribution among the creditors, alleging that the *State* is only entitled to be paid *pari passu* with the rest.

The deeds which are exhibited with the bill, direct the trustees to divide the property and funds of the bank, when realised, among all its creditors equally and rateably.

After the trustees had answered, admitting the facts stated in the bill, it was agreed, that the question to be decided, was, whether the *State* has any, and what preference, under the circumstances of the cause, over the other creditors. If it be decided, the *State* has no preference, the bill to be dismissed. If she has a preference, then the case shall be remanded to *Baltimore* county court, and before final decree, the auditor shall ascertain the amount of funds in the hands of the trustees, clear of expenses, and such allowances as they may be equitably entitled to, upon which ascertainment such further proceedings shall be had, as are usual in such cases. And it was further agreed, that *Baltimore*

county court should pass a *pro forma* decree dismissing the bill.

Such a decree was accordingly passed, and the record upon the appeal of the *State*, brought before this court.

The cause was argued before BUCHANAN, Ch. J., and STEPHEN, DORSEY, and CHAMBERS, J's.

*Taney, Dixon,* and *Price,* for the *State* contended,

1. The right asserted on the part of the *State*, is not a lien, or charge on the person or property of the debtor; but a right founded upon the common law to a priority of payment, whenever its rights, and the rights of the citizens came in conflict, and when as between individual creditors, there would be a *pari passu* abatement. The right is a personal privilege, attached to the person of the sovereign, and comes into existence when his right, and the rights of private persons are brought into collision. 5 *Cranch.* 299. 1 *Black. Com.* 178, 185. 3 *Bac. Abr.* 79. 5 *Ib.* 487, 558. *Tidd's Pr.* 1099. This privilege forms no part of the contract with the debtor, and does not embarrass him. He may notwithstanding the privilege, alien or encumber his estate, and use it in any way, which his convenience, or interest may dictate. It merely regulates and affects the comparative personal rights of creditors, when in other respects they stand in *equali jure.* As regards the debtor, the *State* is but an ordinary creditor. She only stands upon higher ground in reference to other creditors, whose claims are in equal degree. The right does not depend upon process, or the action of the *State.* Whenever conflict arises, whether by process, the death, or the act of the party, not having enough to pay his debts, the right attaches, as a sovereign prerogative right; and this right has been expressly conferred upon the *United States* by statute, and neither its constitutionality or policy have ever been questioned. On the contrary it has been deemed a wholesome right, and as such received the saction and approbation of the courts. 6 *Binney,* 271. 2 *Cranch,* 389, 390. 6 *Peters,* 30, 35.

The claim to a priority in payment in *England*, on the part of the king, is founded upon *magna charta* itself, which was written by the property holders of the kingdom, and signed by a conquered king, not for his private benefit, but for the public good. The right is a vested one, and the deed, so far as it proposes to divest it, and place the claim of the *State* on a level with the other creditors is, inoperative. The right being based upon the common law, is adopted by the third article of the declaration of rights, which introduces into the jurisprudence of *Maryland* the whole body of the common law, not inconsistent with the frame of the new government, and subject of course to legislative modification. 5 *Harr. and Johns.* 401. 3 *Harr. and McHen.* 173. The act of 1650, *ch.* 23, shows that this common law principle was recognized and adopted by the colonial legislature. There can be no distinction between this case, and the case of a deceased debtor, whose property is in the hands of his executor or administrator, where according to repeated adjudications, a priority is enjoyed by the *State.*

There is no *English* statute now in force, which gives the king a preference in the case of deceased debtors. It is derived therefore from the common law, which is not limited to that particular case.

The deed in this case cannot be supported if it interferes with the vested rights of the parties. For all substantial purposes, the corporation is dead, and this court will administer its assets, as if such was the case. The deed amounts to a surrender of the charter. 8 *Cowen*, 387. 2 *Kent's Com.* 251. 19 *Johns. Rep.* 456. 7 *Johns. Ch. Rep.* 225. *Angel and Aimes on Cor.* 509. It is the case then of a dissolved corporation, not only without means to pay its debts, but without the capacity of acquiring them, and a court of Chancery, regarding substance, and negligent of forms, must so treat it.

The deed brings the *State* and the other creditors directly in conflict, as they all, and each, seek to be paid out of

the funds covered by it; and they being inadequate to the full payment of all, opposing rights are unavoidably created. Unless the right of priority exists in such a case, it is a mere shadow, capable at all times of being defeated by the mere voluntary act of the debtor. It is not said that property *bona fide* sold and conveyed for the payment of a just debt, is subject to the claim now set up on the part of the *State.* But the question here is, does not the right attach, when the sole object of the deed, is to provide for the payment of debts generally.

As a general proposition, the right of the *State* to a priority in the payment of its debts, cannot be denied. 3 *Harr. and McHen.* 173. 1 *Harr. and Johns.* 417. *Kilty's Rep.* 206. The act of 1650, *ch.* 28, which gives it, was declared by *Bacon* to be in force in 1763. By the act of 1676, *ch.* 2, it was confirmed among the perpetual laws. *Kilty's Rep.* 206.

The third article of the declaration of rights refers to the common law, as known in *England,* and not merely to those portions of it which had been used and recognized in the colonies anterior to the revolution. 5 *Harr. and Johns.* 401.

No inference can be drawn adverse to the existence of this common law doctrine of priority, from the passage of the act of 1650, *ch.* 28. The preface to *Bacon's* compilation of the laws shows that it grew out of previous political dissentions; and the same remark may be made in reference to the act of 1650, *ch.* 23.

The argument that if the right exists as in *England,* that then the *English* remedies must also obtain here, such as the writ of protection, &c. is not sound. Though we may adopt the rule, we are not bound to adopt the remedies; but may fashion them according to the nature of our institutions, and the spirit of our government. The principles of jurisprudence are one thing, and the machinery by which they are carried into operation another, and very different thing. We may adopt the one and wholly reject the other. *Kilty's Rep.* 224, 225, 227, 233.

The case in 3 *Harr. and McHen.* shows that the *process* used in *England* is not necessary here ; for in that case the court took judicial notice of the right of the State, without an *extent,* or any proceeding whatever on its part.

The deeds in the present case are purely voluntary—no consideration passed from the grantee to the grantor, nor was their execution induced by the solicitation of the creditors, or any of them. Reference has been had to the case of *Brooks vs. Marbury,* 7 *Wheat.* 576. But in that case *Marbury,* the grantee, was a stockholder in the *Bank,* whose claim was provided for ; and besides, the contest there was between individuals, and involved no question touching the prerogative of priority. The extent in *chief* is a process used by the king for the recovery of his own debt. That in *aid* by the king's debtors against his own debtor ; and the process in the latter case confers upon the party adopting it, no new right. The case in 3 *Price* was a case of this latter description, and consequently was merely a case between individuals. And the case in *Clarke and Finley,* 91, only decides, that when the *King* sues out an extent in aid he is only clothed with the rights of his own debtor, when he thinks proper to resort to this remedy. All the cases cited on the other side on this branch of the subject, refer to the case in *Price,* and concur in deciding, that the relative rights of the *King's* debtor, and such debtor's debtor are not changed by the recourse to the extent in aid ; and that when the *King* himself resorts to the same process, he stands in the predicament of his own debtor, and has no higher rights.

Though an assignment in bankruptcy, in reference to individual creditors, relates back to the act of bankruptcy, an extent at the suit of the *King* issued in the intervening period between the act and the assignment, will be effectual, and overreach the assignment. The reason why the king is bound by an actual assignment is, that it is a judicial proceeding, a judgment in bankruptcy.

The State of Maryland *vs*. The Bank of Maryland.—1834.

It has never yet been decided that the State is within the insolvent laws. They form of themselves a peculiar system inapplicable in many of their principles and details to the State; which is never included in a law unless expressly named in it, or by necessary implication brought within its provisions. If, however, the *State* could be regarded as within the insolvent laws, with respect to individuals, she cannot be so considered, in relation to a corporation which itself cannot be within those laws, being incapable of imprisonment, or availing itself of the benefit of its provisions.

*Johnson* and *McMahon*, for the appellees.

The claim of the *State* is founded upon a mere simple contract, not prosecuted against the debtor himself, but the creditors of such debtor, claiming as *bona fide* alienees without notice, and against the very terms of the deed. No priority will be given under such circumstances, unless it arises from some superior equity, or from a lien upon the fund, which follows it as a trust in the hands of the alienee. As against a person employed by the public in the collection of its revenue, there might be some policy and justice in giving the preference claimed here; for in such a case the officer would be known to act in that capacity, and to be a mere custodiary of the public moneys. But in this case the *State* voluntarily, and for the purpose of profit, parted with its money, trusting wholly to the personal responsibility of the debtor, and thus placed herself on a common level with all other creditors. In taking these deposits on interest, the bank in effect increased its capital, and necessarily expanded its circulation. The *State* must have known such to be the design of the bank, as otherwise how could it afford to pay interest on the deposite. She furnished the bank then with the means of enlarging its business, and increasing the amount of its responsibilities; and after doing this, if she is permitted to engross the whole fund to satisfy her claim, or take more than her due proportion, she will be allowed to perpetrate a fraud upon the other creditors. It

has been said, that the deposite was made under the authority of a resolution of the legislature, of which all persons are bound to take notice. But the resolution does not designate the bank in which the deposite was to be made; and besides, with regard to *prior* creditors, against whom also the preference is claimed, there could have been no notice either in law or in fact. If a preference is awarded the *State* in this case, she will be equally entitled to be preferred in every case in which she is a joint stockholder in the bank, or any other company, after the payment of the debts of such bank or company. No distinction can be taken between joint depositors and joint stockholders. If prerogative prevails in the one case it will in the other; and the same will be the case, whenever a *State's* debtor, being insolvent, shall undertake to alien his property, though the alienee may be alike ignorant of his indebtedness or insolvency. Such secret trusts or liens have always been discountenanced by the courts.

The right now claimed on the part of the *State* must be either inherent or derivative. It cannot be inherent and original, as a sovereign right, for as such it is forbidden by the genius of our government, all of whose powers are derived from the constitution or laws. None of the departments of the government, nor the whole combined, possess any of that class of powers which emanate from the prerogative.

The rights of the *State*, under the constitution, reside in the legislature, and until they are called into action by that branch, the organ of the sovereign will, no other department can exercise them. But suppose such a right to exist in ordinary case, would it be applied to one like the present, in which the *State* became a creditor, by depositing her money for hire. By so doing she placed herself on a common platform with all the other depositors, and must share one common fate with them. 9 *Wheat.* 904. 3 *McCord.* 377. Not a case can be found in the *United States*, in which a priority of payment has been successfully asserted

upon the ground of prerogative. 1 *Dessau.* 450. *Appendix*, 599. The priority in favor of the *United States* is founded upon statute. *Act* 3*d March*, 1798. 2*d March*, 1799. 4 *Wheat.* 118, (*note.*) 2 *Cranch.* 391. 6 *Peters*, 30, 35.

2. Nor is it derivative from the king or proprietary.

At the common law, the mere indebtedness of a party did not give the king a lien on his goods and chattels, nor did the commencement of a suit, nor the mere rendition of a judgment. There must be an execution, and a previous alienation of goods and chattels by the king's debtor would be good against him. 16 *East.* 280. *Coke Lit.* 131, (*B.*) *Stat.* 23*d*, *Ed.* 3, *ch.* 19. 33 *Henry*, 8 *ch.* 39. 1 *Clarke and Finley*, 120. If the property of the king's debtor is altered, the right of the king is gone. 5 *Serg. and Low*, 122. 1 *Clarke and Finley*, 72. 2 *Wm. Black. Rep.* 1251. 4 *Durnf. and East.* 402. If the king's debtor mortgages, or pawns his goods for money, it is good against the king. 6 *Price*, 369. As is likewise an assignment in trust like the present, for the general benefit of creditors. 3 *Price*, 6. *Chitty's Prerogative*, 285. 9 *Peters*, 326. 2 *Tidd.* 1038. When this deed was executed the *Bank* was in possession of all her chartered rights, and of course had power to contract and pay debts. In *England*, at the common law, the king, though the *Bank* was perfectly solvent, might have issued the writ of protection, and thus prevented her from paying any debt before his own was satisfied.

The statute of *Henry* VIII. places the crown and an individual creditor on an equality before suit brought; and therefore, unless the *State* has rights superior to the *King*, since the statute, she cannot be entitled to a preference. These statutes were intended to soften the rigor of the common law in this respect, and yet are declared by *Kilty's* report not to be in force here ; the inference from which is, that the doctrine itself to which they relate is not in force. If the doctrine is in force here unmitigated by the statutes,

then we have it, as at common law, with the writ of protection, and all its other incidents. 2 *Cranch*, 402.

The declaration of rights, only incorporated into our laws the common and statute of laws of *England*, as they existed at the *time* the declaration was made. Though adopted in mass, the principles of the common law, are qualified by the nature of our institutions. It was adopted for the regulation of the rights of citizens *inter se*, and not as applicable to the government, or to confer political power upon it. That declaration was not designed to arm the government against the citizen, but to protect the citizen from the government. Nor can the right be deduced from the act of 1650, *ch.* 28. That act was for the benefit of the lord proprietary, as the executive head of the State, so long, and so long only, as he filled that situation. And that law was not in force at the time of the revolution. Act of 1676; 1692, *ch.* 84; 1704, *ch.* 77.

But suppose the right to exist, it is a mere priority, and not a lien attaching itself to the fund, and may be defeated by a *bona fide* conveyance. 4 *Wheat.* 108. 2 *Cranch,* 390. 3 *Ib.* 89. 2 *Wheat.* 435. 1 *Peters,* 438. 4 *Peters,* 36. 2 *Tidd.* 798 to 1000.

The deed is good and effectual for the purpose for which it was executed, though the trustees were not themselves creditors, and though the creditors did not solicit its execution. *Brooks vs. Marbury,* 7 *Wheat.* 578. 11 *Wheat.* 78, 98. 3 *Maule and Selw.* 371.

There is no conflict or concurrence of title in this case; each creditor is entitled to his rateable proportion; just as though the proportion due each had been parcelled out and assigned to him separately.

The case of the *State vs. Walsh,* 2 *Gill and Johns.* 406, decides, that the State was within the insolvent laws.

By the act of 1807, *ch.* 77, a party who makes a preference forfeits the benefit of the insolvent laws; and yet the State, who has been decided to be within those laws, asks a court of equity to adjudge a preference in her favor. The

court is asked to do that, which if done by the party, would be punished as an illegal act.   And as by the act of 1812, the preference itself is void, the State is, if her claim is successful, in a better condition than if the *Bank* itself had attempted to prefer her by deed.  2 *Kent's Com.* 420. *Catlin vs. Bank*, 6 *Con. Rep.* 233.   The execution of the deed did not operate a dissolution of the corporation.  2 *Kent's Com.* 250.   19 *Johns.* 456.   4 *Gill and Johns.* 107.   7 *Johns. Ch. Rep.* 226.   *Act of* 1818, *ch.* 177.   1 *Hopkins' Ch. Rep.* 303.   8 *Cowen*, 387, 395.

BUCHANAN, Ch. J., delivered the opinion of the court.

Before the institution of this suit, there were deeds of trust executed by the *President and Directors of the Bank of Maryland* to *Thomas Ellicott*, on the 23d of March, 1834, and the 26th of March, of the same year; and by the *President and Directors of the Bank of Maryland*, and *Thomas Ellicott*, on the 5th of April following, to *Thomas Ellicott*, *John B. Morris* and *Richard W. Gill*, of all the estate, property, funds, rights and credits of the bank, wherever situated, in trust, to divide the same whenever realized and collected, among *all* the creditors of the bank *equally* and *ratably*.

The object of the bill is not to set aside the deeds, or either of them, but to subject the property and funds covered by them, in the hands of *Ellicott*, *Morris* and *Gill*, as trustees, calling, and treating them as such throughout, to the payment of the entire debt due from the bank to the *State*, in preference to the other creditors, and to their exclusion.

The prayer of the bill is, that the *President and Directors of the Bank of Maryland*, and the trustees, *Ellicott*, *Morris* and *Gill*, shall be compelled by decree to pay the amount of the State's claim, $50,089 96, with interest at the rate of 5 *per centum*, out of the funds in the hands and possession of the *trustees;* and the ground taken in argument is, that the *trustees* took, and hold the fund under

*their* deed, subject to the preference claimed by the *State*, not as against, but under that deed; the question as to the validity of it not being considered open for discussion, the then members of this court having heretofore determined, on the application of the *Union Bank of Tennessee*, for an injunction against the *Trustees of the Bank of Maryland*, that it was a good and valid deed, and we have perceived no reason for changing that opinion. It has been more than once decided by this court, that a debtor in failing circumstances may prefer one creditor to another, by a transfer of his property made in good faith. And if, according to circumstances, one creditor may be preferred to another, it would be difficult to imagine an objection to the validity of a transfer by a debtor of his whole estate, to trustees, for the equal benefit of all his creditors. Equality is equity, and when a debtor makes a transfer of his property for the fair purpose of equal distribution among his creditors, he does an honest act, and discharges a moral duty, which none can reasonably complain of; and to which objection can seldom be made, except by such, as may seek to secure their own claims at the expense of the other creditors. In such case, it would not be the debtor seeking to evade or defeat the rights of the creditors, whose interests, according to the extent and character of their respective claims he proposes to protect, but the particular opposing creditors, seeking to draw to themselves more than their just proportions of the debtor's effects, to the prejudice of the other creditors. So that if there be any thing unfair, it would seem to be chargeable, not to the debtor in attempting to secure an equal and just distribution among his creditors, but rather to the creditor attempting to prevent such equal distribution, and to secure his own claim to the exclusion of the other creditors. For it is only with the view and expectation of securing his own debt, or advancing his interest beyond that of the other creditors, and not to procure a just and equal distribution of the debtor's property, that a creditor will seek to set aside such a deed; since the deed

itself if suffered to stand unimpeached secures that object.

Looking beyond the decisions of this court, before adverted to, which were founded upon the insolvent and other existing laws of the *State*, and which it is not thought necessary to examine in this place, it will be seen, that the same subject has been investigated, and the same principle maintained elsewhere.· *Pickstock vs. System*, 3 *Maule. and Selw.* 372, is a case in which a debtor in insolvent circumstances being sued by *Pickstock,* one of his creditors, he suffered a judgment by default, and after a writ of inquiry executed, made an assignment by deed of *all* his effects to trustees, for the benefit of *all* his creditors, embracing of course the plaintiff in the judgment : after which a *fi fa.* was delivered to the sheriff, who levied under the *fi fa,* and *Pickstock,* the judgment creditor, brought suit against the sheriff to try the validity of the assignment, and whether the property passed under it from the debtor to the trustees ; and it was held, that the assignment was not fraudulent under the *Statute* 13 *Eliz.* but passed the property, although made with intent to delay and defeat the particular creditor, by depriving him of the benefit of his execution, who would thereby have gained an advantage over the other creditors, on the ground, that notwithstanding such was the intention and effect of the assignment, yet that it was for the benefit of all the creditors, of whom he was one, and was placed by the assignment in the same situation with the rest of the creditors, who had an equal right to a fair distribution.

In *Hendricks vs. Robinson*, 2 *Johns. Ch. Rep.* 289, an assignment by a debtor in insolvent circumstances, being *bona fide* to secure a particular creditor, was held to be good, and to pass the property, on the ground that "the object of the statute of frauds, was to prevent deeds, &c. fraudulent in their inception and intention, and not merely such as in their effect might delay or hinder other creditors.". So, in *Halliard vs. Anderson,* 5 *Term. Rep.* 233. *Estwick vs. Caillard,* 5 *Term. Rep.* 420.   *The King in aid of Braddock vs. Watson and another,* 3 *Price Rep.* 6.   In

this last case the assignment was of all the property of an insolvent debtor, for the benefit of all his creditors, as here; and it was held to be good and valid to pass the property out of the insolvent debtor to the trustees, notwithstanding he was a trader, no commission of bankrupt having been sued out.

*Marbury vs. Brooks, and Brooks vs. Marbury,* was a case of attachment sued out by *Brooks,* a creditor, against the lands, tenements, goods, chattels and *credits,* of *Fitzhugh,* an absconding debtor, and laid in the hands of *Marbury,* who claimed and held the property, &c. under a deed of assignment to him by *Fitzhugh,* of all his estate, executed before the attachment was issued, for the particular benefit of certain preferred creditors, several of the banks in the *District of Columbia:* and the question was, whether the deed so given to *Marbury,* was valid and effectual to pass the property from *Fitzhugh,* the debtor, to *Marbury,* the trustee, who was not a creditor of *Fitzhugh,* and it was held, that it was, and that it vested *ab initio* the legal estate in the trustee, although the banks, for whose particular benefit it was made, had not expressed their assent to it, and were in fact ignorant of its execution at the time it was given. The debts due to the banks having been considered a valuable and fair consideration, and *Chief Justice Marshall,* who delivered the opinion of the court, using this emphatic language, "if *Fitzhugh* might have conveyed directly to the banks with power to sell for their own benefit, why might he not convey to *Marbury,* with power to sell and pay the money to the banks? If a real distinction exists between the cases, we are incapable of perceiving it." And again, that a debtor "may *sell* to a fair creditor, or for the benefit of a fair creditor." And the same doctrine is maintained in 2 *Kent's Com.* 420.

In neither of the cases adverted to, was the deed of assignment executed by a corporation, but that it is conceived makes no difference, and that the principle is the same whether the deed be by a corporation or an individual. A corporation as well as an individual is bound to provide for

the discharge of its debts, and whether the payment is made by sale of property for that purpose, or with money from its vaults is not material. Its property may be seized and sold as in the case of an individual, under an execution for the payment of its debts. Why then, may not the corporation itself, instead of waiting for a judgment and execution, sell the same property for the payment of the same debt, for which it is liable to be sold under an execution? And as a *bona fide* assignment of his property by an insolvent individual to a trustee, for the benefit of his fair creditors, is a valid sale and transfer of the property for a valuable consideration, a like transaction by an insolvent corporation, in relation to property subject to its debts, is equally a good sale and transfer of it. No satisfactory reason has been advanced, and none is perceived why a corporation in failing circumstances, unless restrained by some express provision in the charter of incorporation, which is not the case here, may not assign its property to trustees, for the benefit either of preferred creditors, or of all its creditors equally, as well as an individual in insolvent circumstances. The same relation of debtor and creditor subsisting in one case, as in the other.

In *Catline vs. The Eagle Bank*, 6 *Con. Rep.* 233, the question was distinctly raised, on a bill to set aside a mortgage by the *Eagle Bank*, after it had failed, and was in fact insolvent, of its real estate, and an assignment of sundry promissory notes to a *Savings Institution*, a preferred creditor, and to subject all the funds that belonged to the bank at the time of its failure, to an equal distribution among all its creditors: and the court decided, that the mortgage and assignment to the *Savings Institution*, the preferred creditor, were good and valid, and could not be set aside by Chancery, and dismissed the bill.

If then, this had been a bill by an individual creditor, there could, it is believed, be little doubt that it could not have been sustained. Indeed it has already been determined by the judges of this court, in the case of the *Union*

*Bank of Tennessee,* a creditor to a very large amount, that this very deed is good and valid in law and equity: and the bank not being a person capable of taking the benefit of the insolvent laws of this *State,* is not within, or affected by the provisions of the supplements of 1812, *ch.* 77, *sec.* 1, and 1816, *ch.* 221, *sec.* 6, which declares, "that any deed, &c. made to a creditor or security by any person, with a view, or under an expectation of being or becoming an insolvent debtor, and with intent thereby to give an undue and improper preference to such creditor or security, shall be void." The words "with a view, and under an expectation of being or becoming an insolvent debtor," being held by settled construction to mean, *"with a view, and under an expectation of taking the benefit of the insolvent laws,* that is, of becoming a technical insolvent, and not a mere insolvent in fact; which view or expectation the bank could not have had, as it could not become an insolvent in the meaning of those laws, and the very provision shows the understanding of the legislature at least to have been, that without it, a deed made by an individual debtor, capable of taking the benefit of the insolvent laws, to a creditor or a surety, might be valid and effectual to pass the property; otherwise such a provision would have been unnecessary : and a deed for the benefit of all the creditors equally, or of a particular preferred creditor, that would be good in the case of an individual debtor in insolvent circumstances, as against an individual creditor not having a prior lien, would be equally good in the case of a bank in the same circumstances, as against the same description of creditor. But it is urged that the *State* has a preference in the payment of debts in cases of insolvency, and in this case has the right to have the amount of its claim first paid out of the funds of the bank, in the hands of the trustees, the bank being insolvent in fact when the deed was given; which right of preference is supposed not to be affected by the deed of trust: and the real question that we are called upon to decide is, whether the *State* is entitled to such preference.

This is a question of some delicacy and of much importance, both as it respects the amount in controversy, and the principle involved, and has received all the attention its importance entitles it to.

We have not been distinctly informed by the solicitors for the *State*, whether this preference, sometimes called in argument a prerogative preference, or priority, is claimed as being given by the act of the then province of *Maryland* of 1650, *ch.* 28, or as being derived from the common law; but it has been claimed and insisted upon, as a right devolved upon the *State*, by one or the other; though it has been principally asserted as a common law right, secured to the *State* by the third article of the declaration of rights of this *State*.

Although as has been observed, this preference has been chiefly insisted upon as a common law right, it may be proper to inquire, 1st, what rights were conferred by the acts of 1650, *ch.* 28; and 2d, whether it was in force at the time of the revolution.

First then, looking to the language of that act, and it would seem from the expressions used, that the preference was given to the *Lord Proprietary* personally, and to *his heirs*, as long, and so long only, as *they* should be the *Lords Proprietaries* of the province. The words of the act being, "that all debts which either are, or shall be, from time to time, really and truly due to his *Lordship*, or his *heirs*, *Lords*, and *Proprietaries* of this province, shall be first paid and satisfied within the said province, before any other debts whatsoever." And that whenever he, (the then lord proprietary) and his heirs shall cease to be the lords proprietaries of the province, the preference given to them was to cease also, and would not under that act devolve upon any other. And that when by the revolution, the proprietaryship was abolished, the preference attached to it sunk with it, and was not transmitted to the *State*, if the act giving it continued to be in force up to the time of the revolution.

But secondly, was it in force at that period? By an act of 1676, it was made perpetual. In 1689 the colony revolted, and the *Proprietary Government* was overthrown, and became a *Royal Government;* and so continued until 1716, twenty seven years, when the proprietary government was restored; during the whole of which time the priority in the payment of debts due to the proprietary, given by the act of 1650, *ch.* 28, was at least suspended. In 1692 when the colony was under a royal government, free from the dominion of the proprietary, by an act of that year, *ch.* 84, all the laws made in the province before that session of the legislature, including of course the act of 1650, *ch.* 28, were repealed. By the act of 1700, *ch.* 8, declaring what laws were in force, the repealing law of 1692, was expressly saved. The act of 1650, *ch.* 28, then, which had been repealed in 1692, was not in force from that time up to the year 1704, when a law of that year was passed declaring "all acts of assembly of this province, made and enacted at any time before the session of assembly, begun and held at the port of *Annapolis*, on the 26th of April, 1704, to be repealed and made void, except the acts of 1702, *ch.* 1, and 1696, *ch.* 24, and except the act for keeping good rules and order in the port of *Annapolis*, and which are not revived, saved, and enacted, this present session of assembly." This act of 1704, repealing all prior acts, but such as are embraced by the exception, was in force at the time of the revolution. But it is supposed that the act of 1650, *ch.* 28, was revived by the exception in the act of 1704, of "all acts *revived, saved,* and *enacted*" during that session; on the ground that the repealing act of 1692, being repealed by the act of 1704, the effect was, to revive all the acts repealed by the act of 1692, but the act of 1704, by repealing *all laws passed before,* necessarily repealed not only all prior repealing laws, but precluded the revival of all antecedent acts not saved by the exception. It cannot be understood, as meaning at the same time, both to repeal and revive the same law; and the exception could only have been intended to save such of the

antecedent laws, as had before, but at the same session, been revived, of which there were several—and that is shown by the express exception of the acts of 1702, *ch.* 1, and 1696, *ch.* 24, and the act for keeping good rules and order in the port of *Annapolis.* The words, "revived, saved, and enacted," meaning such acts as had been expressly revived, and enacted, otherwise the language would have been, *which are not hereby revived;* to revive a law by repealing a repealing law, not being to enact it. The fact that in 1704, there was no proprietary government, or lord proprietary, and had not been for fifteen years before, and was not for twelve years after, with no prospect in 1704 that it would ever be restored, is of itself sufficient to show, that it was not the intention of the legislature to revive the act of 1650, *ch.* 28, giving the priority which was conferred on the lord proprietary by that act as the head of the government, when there was no such government or head, or prospect of it. Besides, at that very session of 1704, an act was passed, *ch,* 42, stripping him, who fifteen years before had been the lord proprietary, of a grant of duties on tobacco given in 1671, and granting the same duties to the crown. Can it then be supposed that the same legislature, so dealing with other antecedent grants, intended to revive a personal preference when there was no proprietary to exert it.

And again, if the act of 1704, by repealing the act of 1692, revived the act of 1650, *ch.* 28, which had been repealed by the act of 1692, it also revived all the other laws repealed by the latter act, among which was the act of 1650, *ch.* 23, declaring the then proprietary to be "true and absolute lord and proprietary of the province." And will it be said, that in 1704, when there was no proprietary government, nor for twelve years afterwards, the government of the province being then a royal government, the legislature intended to revive the act of 1650, *ch.* 23, declaring *Cæcelius, Lord Baron of Baltimore,* to "be true and absolute lord and proprietary of the province." To ascribe to them that intention would be to be impute to them

a gross absurdity. And yet, if the words, which are not *revived, saved,* and *enacted, this present session of Assembly,*" had the effect to revive that act of 1650, *ch.* 28, being quite as applicable to one as to the other, and which cannot be admitted. The priority then, that is claimed in this case, was not derived to the *State* by the act of 1650, *ch.* 28, which it is conceived was not in force at the time of the revolution.

This brings us to the inquiry, whether it is given by the third article of the declaration of rights, made on the third of November, 1776, which declares, "that the inhabitants of *Maryland* are entitled to the common law of *England,* and the trial by jury, according to the course of that law, and to the benefit of such of the *English* statutes as existed at the time of their first emigration, &c., and also to all acts of assembly in force on the first of June, 1774, except such as have since expired, or have been, or may be altered; &c. This asserted priority has been denounced, as an odious prerogative, springing up in the barbarous and tyrannical ages of the *British* government, and inconsistent with the genius of our people and the spirit of our institutions; and it is contended that the object of the third article of the declaration of rights, was only to secure to the inhabitants of the State the benefit of the common law as a system of laws, or rules of action, in questions of *meum* and *tuum* arising between individuals.

It is not our purpose to inquire into the origin of this royal prerogative right of preference in the payment of debts, as it formerly existed in *England,* or to trace it through its various statutory modifications. It is enough that it constitutes a branch of the common law of *England,* and that the common law has been adopted in this State, by the general terms of the declaration of rights. The only question is, whether that branch of the common law has been adopted. To the suggestion, that the common law was only adopted as a rule of action in controversies between individuals, the answer is this; if it was only adopt-

ed to that extent, whence did we derive our whole system of criminal jurisprudence, depending upon the principles of the common law, and having no relation to controversies in civil suits between individuals.

But in *The State vs. Rogers and Wife, 2 Harr. and McH.* 198, in 1787. *Murray and Sansom vs. Ridley, Adm'x of Ridley, 3 Harr. and McH.* 171, in October, 1793. And *Contee vs. Chew's Ex'r, 1 Harr. and Johns.* 417, in 1803, it was held, that at common law the *State* had a preference, and a right to be first paid out of the estates of deceased persons, where no liens stood in the way. These cases were decided in the late general court, and were not appealed from, but acquiesced in by the parties contesting the right. And in the *State vs. Buchanan, 5 Harr. and Johns.* 317, 358, and *Dashiel vs. The Attorney Genl. Ib.* 392, 401, it was decided by this court, that the common law was adopted by the third article of the bill of rights, "so far at least as it was not inconsistent with the principles of that instrument, and the nature of our political institutions."

It is too late therefore, at this day, to deny the *State's* right at common law, to have its debt first paid out of the property of its debtor remaining in his hands, and no lien standing in the way. For notwithstanding all that has been said in disparagement of this right of priority, it is not perceived to be inconsistent with the principles or spirit of our political institutions. It does not indeed exist here with all the incidents to the royal prerogative right in *England.* We have not the writ of protection, nor the extent in chief, or in aid. And the priority of the *State* is a rule only in the distribution of the property of the debtor, requiring the debt due to the *State* to be first paid, where the individual creditor has no antecedent lien overreaching it.

The government of the *State* is established for the good of the whole, and can only be supported by means of its revenue; which revenue the good of the whole requires to be protected. And as it can only act by its agents, who no matter how vigilant, cannot always be present to protect

its rights, a priority in the payment of its debts, (which must always be of a public nature) is necessary to enable it to accomplish the ends of its institution.

It is not therefore opposed to a sense of right, that the interests of all should prevail over that of an individual, when it can be asserted without disturbing vested rights; which diligent creditors can more readily acquire than the government through its agents. And the *Congress of the United States* proceeding upon the like principle, and feeling the necessity for it, has in certain cases given a preference to debts due to the general government.

Assuming then this right of priority to belong to the *State*, in cases to which it can attach; the remaining inquiry is, whether this is a case of that description, or whether the priority of the *State's* claim, which would otherwise have existed, and might have been enforced, has not been defeated by the act of the bank.

The debt due from the bank to the *State*, is a debt on simple contract only, and not a lien, as is, and must be conceded. The *State* therefore having no lien on the property covered by the deed of trust, but a priority only, in the payment of its claim, if that right of priority has not been lost, it is subject, claiming under the common law, to the same common law rule, applicable to the royal prerogative right of priority in *England*, of the same description. That right in *England* is enforced by the process in the writ of extent in chief, or in aid, according to circumstances, and may be here, by proceedings known to our courts. But in either case, to make it available, the proceeding must be resorted to, before other vested rights to the property sought to be subjected to the claim are acquired.

In 2 *Tidd's Pr.* 1098, 1099, the law upon that subject is thus laid down, "when goods are *bona fide sold*, or fairly *assigned* by the king's debtor to the trustees for the benefit of his creditors, before the *teste* of the extent, they cannot be taken under it, even though in the latter case the debtor was a trader within the bankrupt laws, and the assignment

was an act of bankruptcy." And the examples put by that writer are these. "A factor to whom goods have been sent for sale, and who has accepted bills of exchange drawn on him by his principal to the amount of their value, has a lien on such goods and the purchase money, which lien is available against the crown, when the goods or money have been seized under an extent against the principal for a debt due to the crown. So goods pawned or pledged before the *teste* of an extent cannot be taken under it; because the pawnee, or bailee, has a special property in them; nor for the same reason goods demised, or let to another for a term certain, during the term. But it seems that goods pawned before the *teste* of the extent may be taken as against the pawnee, on satisfaction of the pledge." And in 1099, "that an extent will not operate upon the goods of a bankrupt actually assigned before the *teste* of the extent." The same doctrine is also to be found in *Chitty's Prerogative of the Crown*, 285, and in 281, 284, that the extent is an execution, and binds the defendant's goods *only* from the *award* of the execution. And these writers are fully sustained by the adjudged cases upon the subject. The case of the *King in aid of Braddock vs. Watson and another*, in 3 *Price's Reports of Cases* in the *Exchequer* 6, was the case of an extent in aid against the goods of an insolvent debtor of the king's debtor, (between the effect of which, and an extent in chief, there is no difference) where the insolvent debtor having before the *teste* of the extent assigned his goods for the general benefit of all his creditors, (which was an act of bankruptcy, he being at the time a trader, and within the bankrupt laws) it was held, that the goods were protected by the assignment against the operation of the extent.

*The King vs. Lee and others*, 6 · *Price*, 369, decided in the exchequer, is the case of an extent in chief, issued against an immediate debtor of the crown, who before the *teste* of the extent had sent his goods to a factor for sale, who had accepted bills of exchange drawn on him by the debtor to the amount of the value of the goods; and it was ruled

that the factor had a lien on the goods that was available against the claim of the crown; with a recognition by the court, of the principle, that goods pawned or pledged before the *teste* of the extent cannot be legally seized under it. And in *Giles vs. Grover and another*, decided in the house of lords, 1 *Clark and Finley*, 72, it is treated as a settled doctrine, that goods seized and sold by the sheriff under a *fi fa.* before the *teste* of an extent in chief, or in aid, cannot afterwards be taken under that writ to satisfy a debt due to the crown. And it is conceded throughout, in the elaborate arguments of the judges, "that the crown under its process against its debtor cannot seize the property of another. That when the property has passed from the debtor to another by contract, or a fair and *bona fide* transfer before the *teste* of the extent, or under a sale by a sheriff in virtue of a *fi fa* the extent comes too late, and the priority of the king is lost; and that the crown cannot by its extent avoid an antecedent equitable mortgage, or lien of a factor, or of a wharfinger, or a *bona fide* assignment in trust for creditors, or any other similar assignment or charge; because they are created when the debtor has legal power and authority to create them, and attach upon the goods before the process of the crown; and the crown can only take the goods subject to such liabilities as the debtor has legally created."

We have endeavored to show that this is a fair and *bona fide* assignment for a valuable consideration, and passed the property from the *Bank*, and beyond its power or control. If so, and a similar assignment in *England* has the effect to protect the property against the king's extent, and to defeat his priority, (as we have seen it does) it has equally the effect here, to protect the property in the hands of the trustees against the common law priority of the State. But this has been assailed as a voluntary assignment by the *Bank*, and is therefore supposed to be void as against the *State's* claim, not having been made on the solicitation, or by the coercion of its creditors.

We have seen, that being in trust for the equal benefit of all the creditors, it is not void under the statute of the thirteenth *Elizabeth.* In the *King (aid of Braddock) vs. Watson and another,* 3 *Price,* 6, the assignment was not made at the instance of creditors, but being for their general benefit, it was held to be good against the crown. In *Marbury vs. Brooks,* 7 *Wheat.* 556, and 11 *Wheat.* 78, the assignment was for the particular benefit of certain creditors, (several banks) made not only not at their instance, but without their privity; yet it was held to be good, and the assent to it of the preferred banks presumed, they having expressed no dissent.

The attempt to assimilate the condition of the *Bank,* after the execution of the deeds, to that of a deceased debtor, on the supposed ground that the *Bank,* by the transfer of all its property thereby became dissolved, and ceased to exist as a corporation, rests on no stronger basis.

An executor or administrator takes the funds of the deceased to be distributed according to law, subject to such preferences as the law allows. The moment the debtor dies the law asserts the rights of the creditors, and takes the property into its hands, and makes or directs the distribution of it according to their priority, that being the law of deceased person's estates, which a testator cannot by his will defeat.

Not so in the case of a bank; its funds are in its own hands, and not in the hands of the law; and like an individual, it has the power and authority to pay or transfer them to or for the benefit of its creditors. And although it should by a transfer of all its property render itself powerless to discharge the ordinary purposes of its institution, it still remains a living or existing corporation. But if a mere assignment of all its property, could of itself have the effect to dissolve a corporation, it could only be on the ground, that the deed of assignment was valid and effectual to pass the property out of the corporation—otherwise if the deed was void, the property would remain in the corporaration, and it would stand as if no such deed had been made.

The remaining ground taken by the solicitors for the *State* is, that admitting the deed to be good, and the *State* entitled to come in under it *pari passu*, with the other creditors, that at once brings the right of the *State* into conflict with the rights of other creditors, and thereby entitles it to a preference to the whole amount of its debt—which might be answered by a reference to the case of the *King* (*aid of Braddock*) *vs. Watson and another*, 3 *Price*, 6, where the assignment was for the equal benefit of all the creditors.

But the proposition amounts to this; that the deed is to be first set up as good and valid, in order to let in the *State* to a just proportion of the funds under it, and then to be overthrown *to give to the State* the entire fund, which cannot be ; the deed cannot be good and bad at the same time. If void, and the *State* goes for the whole of its debt, (and it can only do so on the ground of its being void) it must claim adversely to the deed. If good, (and we have said and endeavored to show that it is) it has lost its preference and can only take its just proportion, according to the provisions of the deed. And taking under the deed, there is, and can be no conflict of rights between the respective parties, each creditor's right being only to a just proportion, without disturbing the right or claim of any other. And when neither has a right to the proportion of the other, but each only to his own separate and distinct proportion, how can there be a conflict of rights. It is not like a case of the concurring rights of the king and subject creditor, each seeking to obtain and secure the whole or the same thing, would be a case of conflict. As where there is an execution by the subject, and an execution or extent by the king, before the right or title of the subject is consummated; in such case the king's extent has the preference. But if the property be fairly and *bona fide* changed, or the right of the individual creditor be completed before the extent, either by sale under *fi fa.* or a valid conveyance to him, or to a trustee for his benefit; the extent coming afterwards

will be unavailing.   There being no point of time at which the two rights were in conflict, and nothing for the extent to act upon, after the property ceases to be the property of the debtor.   The right of the *State* being only against the property of its debtor, and not against the property of its debtor's creditor.

We are therefore of opinion, that the preference which the *State* had, so long as the title of the property remained in the *Bank*, is defeated by the deed of trust, and the decree must be affirmed.

DECREE AFFIRMED.