65    317
109   379

65    317
120   343

65    317
127   252

65    317
s32NW  710
e130    60

BENJAMIN F. STAMM ET AL. v. THE NORTHWESTERN MUTUAL BENEFIT ASSOCIATION ET AL.

*Mutual benefit associations—Dissolution of corporation—Equity—Distribution of assets.*

A mutual benefit association was organized under Act No. 104, Laws of 1869 (How. Stat. chap. 118), and continued to exercise its corporate powers until the summer of 1883, when the Commissioner of Insurance refused to license it under Act No. 192, Laws of 1883, in which decision the officers of the corporation acquiesced, and ceased to admit new members or to take or transact new business looking to a continuation of corporate business. At this date the membership of the association numbered about 2,200, and assessments for death losses were thereafter made, and members failing to respond were considered as having forfeited their membership. After the Commissioner's refusal to license, a new corporation was formed under the same name by those active in the management of the old association, which was licensed to do business, and into which many of the members of the old association entered at the request of its managers. A fund of some $50,000 had accumulated belonging to the old association, certain members of which filed a bill to wind up its affairs, and distribute the fund among the members according to their respective rights and interests therein. The foregoing is an outline of the main facts in the case ; and in affirming the decree of the court below, granting the relief prayed for, the Court held :

1. Without passing upon the legality of the action of the Commissioner in refusing a license, the *acquiescence* of the trustees and officers and members in such refusal deprived the corporation of the "moral or legal capacity to resume business."

2. While courts of equity have no jurisdiction, unless conferred by statute, to decree a dissolution of a corporation by forfeiture of its franchise, either at the suit of an individual or the State, yet,

in view of its general jurisdiction over trusts, and to afford remedies in cases where courts of law are inadequate to grant relief, it has jurisdiction to grant relief against a corporation upon the same terms it might against an individual under similar circumstances.

3. Assessing members for the payment of death losses which occurred after the refusal to license was as much doing business as admitting new members, and as much prohibited by law.

4. The inhibition of the statute extended to the exercise of corporate functions in Michigan by defendant, and as no steps were taken by it to remove the bar, but on the contrary it abandoned the field, the proceedings to close up its affairs should date from *that* time, and the members were *then* entitled to their distributive share of the moneys on hand. If losses occurred *prior* to that date, the beneficiaries are entitled to payment of their policies in full from the fund, and, if members have died since, their representatives are entitled to their distributive share. The expenses of closing up the affairs of the corporation in this suit, with the costs of the litigation, will be paid out of the fund, and the balance be distributed *pro rata* among the members at the time the license was refused.

Appeal from Wayne. (Jennison, J.) Argued January 19, 1887. Decided April 14, 1887.

Bill to wind up the affairs of a corporation and distribute its assets. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*F. A. Baker,* for complainants.

*Isaac Marston,* for defendants.

CHAMPLIN, J. The bill of complaint states that the Northwestern Mutual Benefit Association is a corporation organized in April, 1879, under an act entitled "An act to provide for the incorporation of co-operative and mutual benefit associations," approved April 3, 1869; that complainants are members of said association, and each of them holds a certificate of membership in the second division, otherwise known as the "endowment division;" that all of their certificates were issued prior to the eighth day of June,

1883; that from assessments paid by them, and the other members of said endowment division, the association had collected, and on the eighth of June, 1883, had on hand, to wit, $60,000 and upwards, in money and securities, which sum constituted the "endowment fund" of the association, out of which complainants and other members of the second division were entitled to receive their respective endowments at the maturity thereof.

That Act No. 192 of the Public Acts of 1883 took effect June 8, 1883, and soon thereafter the said association applied to the Commissioner of Insurance for license thereunder, which he refused to grant, upon the ground that the endowment certificates issued by said association were not authorized by the act under which it was incorporated, and the amendments thereto.

That, after the refusal of the Commissioner of Insurance to issue a license, the officers, trustees, or managers of the association organized a new one by the same name, but leaving out the endowment features, and obtained for said new association from the Commissioner a license to do business under the act of 1883; that upon the organization of the new association, to wit, on the fifteenth day of February, 1884, James M. Barbour, the secretary of said association, by authority of the board of trustees thereof, issued and sent to complainants and the other members of the endowment division a printed circular, setting forth the failure to obtain license, and the cause thereof, and that the new association had been duly licensed; that there had been for some time a number of dissatisfied members in the old association, who had appointed a committee, who had met with the trustees of the association to arrange, if possible, the differences between them; that an arrangement was made by which the trustees agreed to pay for reinsurance in the new association whatever might be found to have been paid by each member beyond the actual cost of his insurance, or, in case he pre-

ferred to withdraw from both associations, to pay him in cash one-half that amount; that the complainants were not satisfied with the propositions, and they each refused to accept either of the offers therein made.

They charge that it is the intention of the trustees and officers of the association to turn over and appropriate to themselves, or to the new association organized by them, the said endowment fund of $60,000; that they are informed and believe, and charge the fact to be, that it is the intention of said trustees and officers to retain, as the supposed actual cost of insurance, a large portion of said fund of $60,000, and to convert the same to their own use, or to the use of the new association so organized by them; that said association has no legal right, or color of right, to transact business since it was refused a license, but that the trustees and officers thereof have not wound up its affairs, or instituted any proceedings for that purpose, nor have they rendered any account to the members of the disposition made by them of the funds of the association, or of their official management of its affairs. They assert that said endowment fund is the property of the members of said endowment division, the same having been voluntarily paid in by them in the belief that it was competent for said association to issue said endowment certificates.

The bill is filed for and in behalf of themselves, and all other members of said endowment division, and prays—

1. That the affairs of the association may be wound up.

2. That said endowment fund may be apportioned and distributed among the members of said endowment division according to their respective rights and interests therein.

3. That said association, and the officers and agents in charge thereof, may be decreed and required to pay to complainants, and to each of them, the amount due them, respectively, from the funds of the association.

4. That a receiver may be appointed to take possession of the endowment fund, and all other assets of the association.

5. For general relief.

The defendants answered, denying that complainants are members of the Northwestern Mutual Benefit Association, or that they have any interest whatever therein, and allege that all of complainants except Allois Meyer have failed to pay assessments made against them by the association to pay death losses, and that their certificates of membership have become forfeited and lapsed, and that Allois Meyer has surrendered his certificate to the association. The deaths, assessments, notices thereof to complainants, and their neglect to pay, by which, under the policies and by-laws of the association, they ceased to be members, are fully set out in the answer.

They admit that from payments made by members of the association, and for the purpose of meeting the contracts of the association, a fund amounting to about $60,000 has been accumulated, and allege that it has been accumulated for the purpose of meeting outstanding contracts of insurance with the members of the association; that the contracts outstanding are still unmatured, and the funds of such association, together with such assessments as may be necessary, are required to meet such contracts as they mature, and death losses as they occur.

They admit that the Commissioner of Insurance declined to grant said association a license upon the ground that the endowment certificates issued by said association are not within the scope of the law under which said association was organized, but deny that his decision was correct, and allege that all contracts made by the association are valid and binding upon it.

They deny that the trustees of the association have any right to divert the funds paid in by members for the purpose of meeting its obligations from the purpose for which they were paid, or to distribute them among persons who are no longer members of said association.

They aver that they have outstanding certificates of insurance held by members in several states and territories named,

and in the District of Columbia; that there are 968 endowment certificates in force, which mature in from 10 to 20 years, and to meet which not only the fund on hand, but a much larger fund, will be needed.

They admit the formation of a new association leaving out the endowment feature, but deny that the same was organized by the officers, trustees, or managers of the old association, and allege that it was organized by a number of individuals acting for themselves, without reference to the old association, and that the same is in no way connected therewith.

They admit the sending of the circular mentioned in the bill of complaint, and that the same was authorized by the board of trustees, and they set out the circumstances under which the same was prepared and sent to the members; that it was not the intention to force any member to settle his contract with the association, but simply to give him an alternative, if he desired to withdraw from the association, to do so, and provided for paying him as large a sum as could be done consistently with the reserve required to meet the outstanding obligations; that the trustees were able to make an arrangement with the new association by which the old members could, if they so desired, reinsure and secure substantially the same advantages for one-half the money as other persons insuring in said association, and hence made the alternative proposition mentioned in said circular.

They deny that it is the purpose and intention of the trustees and officers of said association to turn over or appropriate to themselves, or to the new association organized as aforesaid, any portion of the endowment fund, or of any other fund belonging to said old association; and, on the contrary, allege that they regard said fund as a trust, and only consider themselves authorized to pay the same in discharging the obligations for which the same had been collected; and allege that no part of said funds had been in any way diverted from the purposes for which the same had been collected.

In 1869 the Legislature enacted a law authorizing the incorporation of co-operative and mutual benefit associations, by section 1 of which it was provided—

"That any number of persons not less than five may become a body corporate and politic, for the purpose of securing to the families or heirs of any member, *upon his death*, a certain sum of money, to be paid by such corporation, either out of its fund or by an assessment made upon the members of such corporation, or upon the members of the class in such corporation to which such deceased member belonged, or for the purpose of securing, in the same manner, a certain sum of money, weekly or monthly, to any member disabled from attending to his ordinary duties by sickness or other disability."

The persons incorporating were required to execute under their hands, and duly acknowledge, articles of agreement, which should contain, among other things, the name of the corporation, its place of business, and the period for which it was incorporated, not exceeding 30 years, the objects of the corporation, the number of classes, and the object of the division of such corporation into classes,—all of which were required to be definitely stated; also the terms and conditions of membership therein.

By section 4 it was provided that the affairs of the corporation should be managed by not less than five, nor more than twenty, trustees, who were authorized to adopt by-laws for the corporation, and to change them at their pleasure, except so far as they relate to the rights of the corporation to assess their members, or those of a particular class, and except also so far as said by-laws affect the rights and benefits belonging to or to be derived by the members of such corporation.

Section 6 enacted that—

"All the funds received by any such corporation shall be used in the first instance, or shall be invested, and the increase thereof used (after paying necessary expenses), for the exclusive purpose set forth in the articles of association: *Provided*, that any such corporation may, in its articles of agreement, specify the kinds of securities in which its funds shall be invested."

The defendant the Northwestern Mutual Benefit Association became incorporated under this law. The articles of agreement which formed the constating instrument executed by the corporators are not given in the record before us, and we are unable to determine with precision what they contained with reference to the terms and conditions of membership; but we must presume that those terms and conditions were in accord with the objects and purposes for which the statute authorized the formation of the corporation. Neither does it appear at what precise time the corporation was formed. The earliest act of the corporation, as such, appears in the record to be a certificate of membership issued to complainant Benjamin F. Stamm, which bears date December 8, 1879. Andrew Dimler testified that he joined the association in June, 1879, and that he was one of the first that signed. Adam Schehr joined in September, Thomas Hill in November, Gregory Busch in July, and John H. Witherspoon in June, 1879.

It appears that the corporation adopted by-laws, section 3 of which declared the purpose of the association to be the mutual protection of its members, their widows, orphans, heirs, and devisees; also to provide a certain sum of money for its members after a given time. Section 8 reads as follows:

" Any person of temperate habits and good health record, between the ages of eighteen and sixty years, may become a member of said association by answering satisfactorily all questions proposed in the printed form of application prescribed by said board of trustees, and submitting to a medical examination approved in writing by said medical director, upon the payment of membership fee not to exceed ten dollars, and continue a member thereof, entitled to all the rights and benefits, so long as the amounts levied and assessed upon him by said board of trustees shall be duly paid in accordance with the term of his certificate of membership.''

Section 9, after stating how certificates shall be executed and issued, proceeds as follows:

"ENDOWMENT DIVISION.

" Certificates of membership in the second division of said association shall be issued on the following amounts, to wit:

"Those between the ages of—

18 to 25 years, inclusive, $3,200, payable at death or end of 25 years.

26 to 33 years, inclusive, $2,900, or at end of 23 years.

| 34 to 40 | " | " | 2,500, | " | " | 21 | " |
| 41 to 47 | " | " | 2,100, | " | " | 19 | " |
| 48 to 54 | " | " | 1,800, | " | " | 17 | " |
| 55 to 60 | " | " | 1,500, | " | " | 15 | " |

"ORDINARY LIFE DIVISION.

"Certificates of membership in the third division of said association shall be issued in the following amounts, to wit:

" To those members thereof between the ages of—

| 18 and 25 years, inclusive, | - | - | - | $3,200 |
| 26 " 33 " " | - | - | - | 2,900 |
| 34 " 40 " " | - | - | - | 2,500 |
| 41 " 47 " " | - | - | - | 2,100 |
| 48 " 54 " " | - | - | - · | 1,800 |
| 55 " 60 " " | - | - | - | 1,500 |

—And not more than two certificates on the life of any member in this division of said association shall issue. * * * The application for and certificate of membership shall constitute the contract between the member and said association."

Section 10 provides:

" Upon the death of any member of said association, after satisfactory proofs of such death shall have been duly filed with the secretary thereof, all members shall contribute one dollar to the mortuary fund, within thirty days after due notice of said death shall have been mailed to the last-known address of any member. Whenever there is an amount on hand to the credit of the mortuary fund of four thousand dollars in the second or third divisions, the next death loss occurring in the division having such credit shall be paid without assessing the members thereof, and the balance shall be carried to the sinking fund."

Section 11 provides that failure to pay the assessment within 30 days after notice shall forfeit the member's certificate of membership, and all liability of the association on account thereof to him, and all liability of such member to the association, shall cease.

"Sec. 13. Within ninety days after satisfactory proofs of the death of a member shall have been filed with the secretary thereof, the said association shall pay to the beneficiary or beneficiaries named in any certificate of membership, or in any application for said membership, if living, or, if not living, then to the heirs, executors, administrators, or assigns of said deceased member, as follows: On certificates in second and third divisions:

| On certificate of $3,200, | - | - | - | - | 85 cents. |
|---|---|---|---|---|---|
| "        2,900, | - | - | - | - | 80 " |
| "        2,500, | - | - | - | - | 75 " |
| "        2,100, | - | - | - | - | 70 " |
| "        1,800, | - | - | - | - | 65 " |
| "        1,500, | - | - | - | - | 65 " |

—On every one dollar collected on the assessment for said death, but in no case exceed the amount named in the certificate of membership."

Section 15 provides that at the end of each fiscal year, after paying all losses and expenses due in the third division, the balance of the fund remaining shall be transferred to a sinking fund, and be invested until January 1, 1891; and after that date the income thereof shall be used in paying death losses, without assessing the members of said division. And at the end of the fiscal year any balance in the second division shall be placed in a sinking fund, to be invested in the corporate name of the association, none whereof shall be used for expenses of management. The account of the funds collected and disbursed for each division shall be kept separate, and the funds of one division shall not be liable for losses occurring in another.

A peculiarity of these by-laws is that no mention is made of a first division from first to last, and yet it appears from the testimony of Mr. Barbour, who acted as secretary of the corporation, that there was a first division, which was an endowment division, in which the periods of payment matured from 15 to 30 years, while in the second division, he testified, they matured in from 15 to 24 years. He also testified that there were only about 100 life policies, or those belonging to the third division, issued, and that the corpora-

tion commenced to issue life policies about the first of January, 1881.

As stated in the bill, and admitted in the answer, the Legislature, at its session in 1883, passed an act requiring all corporations organized under the law above cited to be licensed by the Insurance Commissioner, who should issue to such corporation, complying with section 1 of the act, a certificate of authority to do business in this State, and prescribing a penalty for any corporation, officer, agent, or employe doing business contrary to or in violation of the provisions of the act.  In the summer of 1883 the defendant corporation applied to the Commissioner of Insurance for a license, and it was refused, on the ground that the endowment certificates issued by said association were not within the scope of the law under which said association was organized; and thereupon the corporation, its officers and agents, ceased entirely from admitting new members to the association, and ceased to act as an insurance company in taking or transacting new business looking to a continuation of corporate business.

The point is made in the answer, and we are asked to decide, that the action of the Insurance Commissioner in refusing a license upon the ground he did was erroneous. We do not think, however, that we are called upon in this suit to pass upon that question.  The trustees and officers of the corporation, as well as all the members thereof, so far as appears, have acquiesced in the decision, and have acted upon it as correct and conclusive upon the right of the corporation to transact new business, at least in this State. A new corporation has been formed under the same name, by those active in the management of defendant corporation, which has obtained a license to transact business, and into which many of the members of the defendant corporation have entered at the request of those having the management of the affairs of defendant corporation.  According to the tes-

timony of Mr. Barbour, who is the secretary of the new as well as of the old corporation, the old members who have canceled their certificates in the old corporation, and entered the new, amount to nearly one-half of the membership which the old corporation contained at the time it ceased to do business, and in round numbers amounting to nearly 1,000 persons.

If the members of the old corporation are to be held liable to assessment for the purpose of paying death losses, the effect of this large number of cancellations upon the amount a beneficiary would receive is apparent, and tends to the destruction of the object of the corporation as a means of mutual protection and relief of its members, and their widows, orphans, heirs, and devisees. It also appears from the testimony of Mr. Barbour that the corporation stopped issuing policies from the time a license was refused.

We have here, then, the case of a corporation which circumstances have rendered it impossible to continue to carry on its business successfully, or to attain the object for which it was formed. It has a large fund in its hands which cannot be applied nor used to carry out the original intent for which it was accumulated, and it would appear to be the obvious duty of the managing agents, under the circumstances, to wind up the affairs of the concern voluntarily, under the statute; and, if they neglect to do so, any one interested in the fund may seek relief in a court of equity to obtain a distribution among the members to whom it belongs.

Owing to the peculiar character of corporations of this kind, the question is by no means free from difficulty. It has no shares of stock to represent the respective rights of the holders thereof. Membership therein is personal, and liable to frequent changes. The legal life of the corporation is limited to 30 years. The Legislature, therefore, must have contemplated that a time would arrive when the affairs of these mutual benefit associations should terminate, and their

affairs be wound up. Their funds on hand would necessarily have to be distributed, and who, in that event, would be the distributees? No assessments to pay death losses could be made after the expiration of 30 years, any more than new members could be admitted after that time. It is obvious that each living member at all times stands upon an equality with others in their respective classes. The right of a new member to receive the benefits flowing from that relation does not depend upon the length of time he has been a member, nor how much money he has paid into the common fund. The contract of each with the corporation is like that of every other, and it must necessarily follow that, upon a final dissolution, each member of the corporation at that time would share equally in the fund belonging to the class or division to which he belonged.

I think the same principles must be applied when a corporation ceases to do business because of some impediment in the way of further continuing it with success, as was the case here. Whether the impediment was real or otherwise, it was acquiesced in by the corporation, and no suggestion is made that there is either a probability or a possibility that it can ever resume business, or conduct it with success. It suspended business in the summer of 1883, and has made no attempt since to carry out the object for which it was formed, and, under all the circumstances, it may be considered as established that it has no longer any "moral or legal capacity to resume business."

The doctrine is clearly established that courts of equity have no jurisdiction, unless it be conferred by statute, to decree a *dissolution* of a corporation by *forfeiture of its franchise*, either at the suit of an individual or the State. But this suit is not instituted for the purpose of forfeiting the franchise of the corporation. Its existence is recognized, but facts are set forth showing an actual or threatened misapplication of its funds, and also a virtual surrender of its

franchise of admitting new members. Although a court of
equity may not decree a dissolution of the corporation, yet,
in virtue of its general jurisdiction over trusts, and to afford
remedies in cases where courts of law are inadequate to grant
relief, it has jurisdiction to grant relief against a corporation
upon the same terms it might against an individual under
similar circumstances.

Thus, it was said by Lord Romilly, master of the rolls, in
*Cramer v. Bird*, L. R. 6 Eq. 143:

"I am of opinion that there cannot be a plainer equity
than this: that where the functions of a corporation have
ceased, the managers of that corporation are bound to account
for all monyes belonging to the corporation, and, when such
moneys are improperly retained, this court will make a
decree, in order that they may be divided among the various
members."

He also held that the acts of parliament relating to rail-
way companies, and affording remedies in particular cases,
were not—

"Intended to supersede the principles of equity, but only to
assist the court by giving additional powers, to enable per-
sons to enforce equities without those peculiar difficulties
arising from the number of shareholders and from the rules
of equity, which theretofore had made it impossible for per-
sons in such cases ever to get a decree."

See, also, *In re Suburban Hotel Co.*, L. R. 2 Ch. 737, 743,
750; *Marr v. Bank of West Tennessee*, 4 Cold. 484.

In the case of *Bradt v. Benedict*, 17 N. Y. 93, 96, Mr.
Justice Selden, in commenting upon the statute of that
state authorizing proceedings against corporations in equity,
from which our statute on the same subject was adopted
originally, said:

"It is plainly cumulative, as it adds a rule by which cir-
cumstances are made equivalent to a surrender, which before
had no such effect. The limitation which it contains is not
upon any common-law rule, but upon that which the statute
itself introduces."

In *Slee v. Bloom,* 19 Johns. 456, which was an action by a creditor against stockholders to enforce a personal liability under the statute, making them liable for all debts due and owing by the company at the time of its dissolution, it was held by the court for the correction of errors that the corporation was dissolved, within the meaning and intent of the act, by non-election of trustees and non-user of franchises for a length of time, and a sale by the sheriff of all its property, real and personal, in execution; and Chief Justice Spencer, who delivered the prevailing opinion, regarded the acts done and suffered as equivalent to a direct surrender of the charter.

Upon principle, as well as upon authority, I think that, when a corporation is virtually dead, although its term of existence limited by law has not expired, and it has property or assets which cannot be used in carrying out the purposes of the corporation, remaining in the hands of the corporation, this Court has jurisdiction to distribute such property and assets among its members upon such a basis as shall be just and equitable.

The testimony shows that there is about $50,000, the exact sum not given, which the trustees of this corporation have on hand; and while in their answer they deny that it is the purpose and intention of the trustees and officers of said association to turn over or appropriate to themselves, or to the new association, any portion of the endowment fund, or of any other fund belonging to the old association, and while they assert that they only consider themselves authorized to pay the same in discharging the obligations for which the same had been collected, and allege that no part of said funds had been in any way diverted from the purposes for which the same had been collected, yet they admit of sending out the circulars hereinbefore mentioned, and that nearly one-half of the members had availed themselves of the offer made in said circular, and had insured in the new company,

and accepted a cancellation of their certificates of member-
ship in the old association; and the proofs show that the
trustees have appropriated from nine to ten thousand dollars
of the funds of the old association, and paid the same to the
new association for reinsurance.

These facts show the necessity for the interposition of a
court of equity to prevent a further misapplication of the
funds of the old association, and to decree an equitable dis-
tribution thereof. Otherwise, what is to become of this large
accumulation of money now in the hands of the trustees?
The new association is not entitled to it. The trustees have
no right to appropriate it. It cannot be used in carrying
out the purposes for which it was created. There is no equity
in applying it to the payment of death losses in full, as they
occur, for, aside from there being no contract to that effect,
it would, in the natural course of events, be exhausted long
before membership in the association would be terminated by
death, and those surviving members would receive nothing.

It appears from the testimony that, at the time license to
do business was refused, there were about 2,200 members,
and that, while the association has not since that time
admitted any new members, the board of trustees have
assessed members for death losses, and have considered those
who have failed to pay such assessments as having forfeited
their membership. Assessing members for the payment of
death losses which occurred after the refusal to license is as
much doing business as admitting new members, and was as
much prohibited by law. My opinion is that no assessments
could legally be made by the board of trustees for the pur-
pose of paying losses which occurred after license to do
business was refused.

The inhibition of the statute extended to the exercise of
corporate functions in Michigan. Its proceedings as a cor-
poration were arrested, and, as no steps were taken by it to
obtain the right to do business any longer, but on the con-

trary it abandoned the field, the proceedings to close up its· affairs should date from that time.    The members were· entitled to their distributive share of the moneys on hand from that time.    If losses occurred prior to that time, the beneficiaries are entitled to precedence and payment of their policies in full from the fund.    If members have died since,. their representatives are entitled to the distributive share of such members.    As no separate funds were kept of the differ- ent divisions, no account will be taken thereof in making distribution.    The expenses of closing· up the affairs in this suit will, together with the costs of this litigation, be pay- able out of the fund, and the balance distributed *pro rata* among the members at the time the license was refused. An account will be taken to ascertain the persons entitled, the amount of funds on hand at the time license was· refused, and the *pro rata* due to each member.

The decree of the court below is affirmed, without costs, and the cause remanded for further proceedings in accord-- ance with this opinion.

The other Justices concurred.