# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed May 16, 1892.

## ROBINSON
### VS.
## SUPREME COUNCIL OF AMERICAN FRATERNAL CIRCLE.

## EWALT
### VS.
## SAME.

*Moses R. Walter, W. Benton Crisp* and *Lewis J. Cohen* for plaintiffs.

*Isidor Raynor* and *Bernard Carter* for defendants.

PHELPS and DENNIS, J.J.—

On the 3d of February, 1892, the defendant corporation adopted certain amendments to their by-laws, purporting to effect material alterations in the contracts evidenced by the certificates issued to the contributing members of the order, in number, some

twenty thousand. Immediately thereupon, numerous bills were filed by dissatisfied members against the corporation, some in this court, and others in the Circuit Court of Baltimore City. Differing somewhat in their allegations, the object of all these bills was substantially the same, the winding up of the concern by the appointment of receivers.

The suits first instituted in both courts were so nearly simultaneous that a question of priority was raised. It was deemed proper that this question of jurisdiction should be determined by the judges of the two courts, together. Upon the showing made, it appeared that the case first above named was entitled to priority, and the case entitled thereunder was by consent consolidated therewith. It was then ordered that the hearing upon the merits should also be before the judges of both courts in which cases of similar character were pending, the decision involving a responsibility so grave as the proposed liquidation of a concern whose cash assets actual and accruing, amounted to nearly one million dollars.

No exceptions have been filed to any of the testimony offered, documentary or oral. In the able argument of defendants counsel, it was stated that their preference was to meet the case on its merits, as disclosed by the evidence. The same method will be followed by the court.

Several questions of a more or less technical character were raised by the pleadings and discussed at length which we do not find it necessary to consider. The view which we take of this controversy is limited mainly to the substantial charges of breach of trust and imminent danger to the fund. As incidental thereto, and as bearing upon the question of intent, circumstances of usurpation of power, exclusion of members from representation, *suggestio falsi* and *suppressio veri*, will first be briefly referred to.

In order to understand the scope of this inquiry it will be necessary to premise that the organization known as the American Fraternal Circle is exceptional in its structure.

Ordinarily, benefit societies are organized upon a representative basis. Their grand lodges are composed of delegates from the local lodges, and the supreme lodge is composed of delegates from the grand lodges. (Bacon Ben. Soc., Sec. 11, 144.) They are worked upon the familiar democratic or republican principles to which our people are accustomed. They have their own judicial tribunals to which every officer, however exalted in the hierarchy, is responsible; members, however humble, are protected from oppressive exhibitions of irresponsible power.

The original corporators of the Supreme Council of the American Fraternal Circle have been engaged in experimenting upon an altogether different line. Without at present going into details, it is enough to say *in limine*, that they resolved themselves into a close corporation, designedly excluded all other members of the order from representation in the governing body, appointed themselves to all the supreme offices, and made those offices lucrative. They enacted the original by-laws, and have from time to time altered them at their pleasure. They have so framed all their contracts with members, as to claim that the members are absolutely bound to all their alterations of these contracts. They claim and exercise supreme administration over the affairs of the order, without accountability or appeal. There is no judicial machinery provided to hold any of their number responsible upon any charge whatever, except to a committee of their own body. There is no means provided by which the order, if dissatisfied, can remove any one of them from office, or substitute a more acceptable person.

In direct violation of Statute Law, they have attempted to extend their own term of office to four years, failed to hold annual elections, or any other elections, and of course failed to give any public notice of such elections. (Article 21, Section 57.)

Over the general fund of the order their control is virtually absolute. Over the reserve fund the by-laws provide for an outside Board of Trustees, whose signature is required to its withdrawal. Since they claim the right to repeal by-laws at their discretion, the protection thus afforded is precarious at best, and it is shown that the function itself is practically of a nominal character.

These six Supreme Officers are the real trustees. The large amounts of money in their custody are trust funds,

the cestui-que trusts are the certificate holders.

In view of the unlimited confidence reposed, of the magnitude of the interests at stake, of the opportunities for abuse, and of the extensive powers assumed and exercised, the circumstances here are such as to devolve upon the trustees a very high degree of responsibility. Their position is one of their own making, and is such as to exact of them the utmost good faith. They must expect to be held at all times to a strict accountability. The temptations to abuse powers so unusual in their scope require corresponding vigilance on the part of the court. The defenceless position of the certificate holders, their inability to secure protection within the lines of the order, the fact that they are practically at the mercy of the trustees, all these circumstances are to be held in view when considering the conduct of the trustees as to good or bad faith.

Such being the peculiar character of this organization, as we find it, the first inquiry relates to the manner in which the trustees have used or abused their legislative power in such wise as to exclude all their fellow members of the order from representation in the governing body.

In the original by-laws provision was made for the election of State representatives. The Supreme Council at the outset of its career appeared before the public claiming to be partially, at least, a representative body. No State representative has ever been elected; but the by-laws have been so altered, by successive enlargements of the basis of representation, as to make any such election in effect impossible. Should the constituency in any locality hereafter be increased to the standard at present required, there is good reason to apprehend from past experience that the by-laws will again be changed to meet the emergency, and the basis of representation be again enlarged. There is here plain manifestation of intention on the part of the six managers to retain absolute power.

If it be said that least they had the legal right to make such amendments, what shall be said of their enlargement of their term of office to four years?

This was done by changing the by-laws in direct violation of the Code, and without notice to members or opportunity on their part to be heard.

In thus taking advantage of their fiduciary position and legislative power, the trustees were plainly actuated by private and interested motives. They at once elected themselves to all the supreme offices, and hastened to allow themselves salaries, excessive as to some, liberal as to all. As to three of these offices, there was no authority for compensation in the original by-laws, but this was found to be no difficulty. The manner of doing the thing was especially objectionable and mysterious. The amounts of the salaries have never been fixed by the by-laws, nor by any recorded vote. Their payments have never been entered in an intelligible form in any of the company's books; in fact, the books make no mention whatever of salaries, although it is claimed that the aggregate amounts paid on account thereof are included under the general item of expenses. The only reference that can be found anywhere to these salaries is an account kept by one of the members of the Supreme Council in a small note-book—his own "private book" (see McJilton, Ans. to Int., 41)—in which the amounts paid to the several officers are kept, but which book contains no other accounts of the order. To this book, it is not contended, that any one outside of the six had access; and it was frankly admitted that the reason the fact of the payments of salaries and their amounts was thus concealed was because the officers did not want any one to know what they were getting, as "they considered their salaries private to themselves."

The only authority for the allowance of those salaries was that they were mutually agreed on by an informal understanding kept closely to themselves arrived at quite early in the existence of the order, at a time when its membership was inconsiderable and its fund little or nothing. There was a want of candor—a concealment—about this whole matter of salaries, which affords ground for apprehension as to the future, when it is remembered that the six officers are in no way responsible to the members, and show no disposition to become so.

Notwithstanding the secret allowance to themselves of these liberal, and, in some instances, exorbitant sal-

aries, and notwithstanding the fact that there is no service of any kind rendered by members or agents which is not paid for out of the general fund there has been actual misrepresentation of the true state of affairs.

The officers in their prospectus have assured the public that "the largest part of the business of the order is performed by its members *gratuitously and not by paid agents.*" (Exhibit C, page 10.) When the Supreme Chancellor was confronted with this statement his only reply was: "*I really cannot explain that.*" (Re-Direct, Interrog. 13.)

In view of these circumstances and of others to be noticed, there is too much reason for the charge that the fraternal, benevolent, moral, social and educational purposes claimed in the certicate of incorporation and in circulars, are a mere pretense, and that the company is simply a business concern run mainly in the interest of the managers.

The public was also assured that "all persons having charge of any funds of the order are under a good and sufficient bond (surety companies) for the amount they will at any time have in their possession." (Exhibit C, p. 3—Gleaner, p. 8.) The treasurer had about $50,000 deposited at J. J. Nicholson & Sons in his own name as treasurer, when his bond was only $10,000.

This was a material representation made to inspire confidence and attract members. It should have been scrupulously true. In point of fact, it was, to say the least, an exaggeration. When it is considered that the object was to bring new members under an iron yoke, and to subject their contracts and their contributions to the absolute control of the people making those statements, such exaggerations deserve to be sternly dealt with. It will next be seen how much value there was in this assurance when an opportunity offered to make it good.

The incident now to be mentioned affords also another striking instance of concealment; we refer to Banks' defalcation. The fact of the abstraction by a supreme secretary of over $10,000 from the benefit and relief fund, and of over $1,000 from the general fund was one of great interest to every member. No attempt was

made to sue Banks' bond, but the defalcation was quietly covered up by the other officers contributing from their salaries. What would be thought of a bank whose officers, under like circumstances, should follow such an example? Should another peculation occur in the future, to a much larger extent, what guarantee have the members that the managers will not increase their salaries to the required amount to cover up the deficiency? It can be done simply by following precedents of their own making, without any change in the by-laws, and without any entry in the minutes.

There is still another striking instance of concealment in the matter of the amendments of 3d of February, 1892. As will be seen further on, the fundamental scheme of association was radically changed by these amendments, and yet in the misleading call for a convention of delegates to endorse them all indication of their purport and of the real object of the meeting was studiously suppressed. (Exhibit J. W. F. No. 1.) To say that this was uncandid, would be a mild way of putting it.

The result of investigation thus far has been to find the powers of these trustees extraordinary, their objects mercenary and their methods fraudulent. With these lights, we approach the issue of actual misappropriation and actual danger.

No charge of criminal peculation is made as against the present trustees. It must be said to the credit of the supreme officers, with the exception already mentioned, that they have not availed themselves of their ample opportunities to embezzle the large amounts of money confided to their custody.

The first charge to be noticed is that of improper tampering with the benefit and relief fund in the matter of covering up Banks' defalcation.

Banks, former supreme secretary and the founder of the order abstracted $10,949.35 from the principal of this fund and $1,107.45 from the general fund. When the "shortage," as his colleagues call it, was discovered, the accruing interest on that part of the benefit and relief f u n d invested amounted to about enough to make it up. The interest was applied to that purpose, and the transaction was called

square by setting off the amounts claimed to be due by the officers to them on account of their salaries. Neither the amount of the accruing interest thus applied, nor the salaries went upon the books. The salaries were thus in effect paid by the benefit and relief fund, instead of by the general fund. It is not necessary to repeat what has been already said of this transaction under the head of concealment. The misapplication is apparent, since, as its name implies, the benefit and relief fund was set aside as a trust fund for quite other purposes. (Exhibit McJilton A. F., p. 6.)

Comment here is unnecessary, further than to remark that such conduct on the part of fiduciaries is well calculated to excite apprehension and alarm.

So far as the salary question is concerned, it may be added to what has already been observed that from the entire absence of recorded data, and from the obscurity of the testimony of the officers there arises a reasonable apprehension that the surplus of the general fund, after paying expenses, was regarded by the supreme officers as their legitimate profit for division under the name of salary.

We now come to the proximate cause of this litigation, the amendments of February last, and the misapplications incident thereto.

Every certificate issued contains upon its face the explicit and repeated declaration that the contract evidenced thereby is subject to the by-laws and to any amendments thereto that may thereafter be made. This must be taken subject to the implied condition that the amendment is a reasonable amendment, for the by-laws of all corporations to be operative must be reasonable. No authority need be cited for this proposition, which was admitted in argument. A radical departure from the fundamental plan of association, essentially changing that plan, not merely in detail, but in principle, is not in our opinion a reasonable exercise of the reserved power of amendment. Any amendment to further or perfect, in matter of form or detail, the original scheme of association, would, if otherwise objectionable, be within the terms of the contract, while an amendment calculated to defeat or destroy that scheme, or to substitute for it some

other and essentially different scheme, would be an abuse of the power, a violation of the contract, unreasonable and invalid.

Under the by-laws as they stood, certificate holders were entitled to advance payments within certain maximum amounts proportioned to the face value of the certificates, at the end of three and five years respectively. (Art. 10, Sec. 2.)

By one of the amendments in question this provision for advance payments was wiped out, so that payment of no part of the sum mentioned as the face value of the certificate could be obtained until the expiration of the full seven years contemplated as the period of maturity.

It is quite obvious that in joining the association and in contributing to its fund, the stipulation for these advance payments was a material and a flattering inducement. It was, in fact, a prominent feature which sharply characterized the enterprise and gave it an apparent advantage in competition with other schemes. To obliterate it was to destroy the organization as a "short term order" and convert it into a "clear-cut seven-year order." (Exhibit, "Gleaner.")

Another of these amendments provides for repayment to all existing members of three years' standing, who may claim it, the entire amount of assessments paid by them, less any advances for sick benefits or otherwise, when their membership shall cease.

To the extent that this provision may be availed of, it is plain that it amounts to the disbandment of the order, and the dissolution of the benefit and relief fund.

Alterations so revolutionary in the conventional scheme of association might naturally be expected to cause surprise and dissatisfaction. A one sided claim of power over contracts so arbitrary and dangerous was well calculated to excite distrust and alarm as to the future. So impressed was the Supreme Council by the force of these considerations and by the questionable character of the proposition itself that, although it was in contemplation as early as November, 1891, its formal adoption was delayed until the ensuing February, in order to secure for it the apparent endorsement of a convention of delegates. This convention had, of

course, no legislative power, that being in the exclusive possession of the Supreme Council. The moral weight that was expected from their endorsement would have been of much more significance if due notice had been given of the real object of the meeting, and if their advice had been taken before the adoption of the amendment by the Supreme Council. The circumstances under which this so called endorsement was obtained were such as to deprive it of importance as a deliberate expression of opinion from a representative body.

These amendments effected a substantial organic departure from the fundamental scheme, not within any fair and reasonable intendment of the reserved power of amendment. They amount to a confession that the scheme itself was a failure upon the lines originally marked out. Impressed by this conviction, the duty devolving upon the governing body, if disinterested, was plain. It was frankly to admit the hopelessness of the enterprise, and initiate the winding up of the concern. Not being disinterested, they preferred to experiment upon other lines and attempt to alter the contracts of members accordingly, with this litigation as the natural result.

The evidence is, that although the amendments were not formally adopted until February, 1892, the necessity for changing the plan of the order had been apparent to the Supreme Council as early as the preceding November. With this knowledge in their possession, and keeping it to themselves, and with public professions outstanding directly to the contrary effect, they continued making these advance payments under the by-laws, destructive to the success of the order, thus depleting the benefit and relief fund to the extent of about $100,000. This was of course to the prejudice of all other certificateholders than those thus advanced, and in view of all the circumstances stated, was a clear misapplication and waste.

The lapse feature is always relied on as an expected and an indispensable element of all schemes and enterprises of the kind now in court. (Exhibit C, page 11.) It is therefore no sufficient answer to say that members were expected to remain in the order, subject to assessment for the whole period of seven years, and that the "bleeding" of the order by the lapsing of members after being advanced, justified the amendment in question or made it a reasonable one.

With regard to the other amendment, which, as already shown, was a disbandment of the order pro tanto, and therefore unreasonable and invalid, the evidence is that after its adoption the sum of $63,867.50 had been withdrawn from the benefit and relief fund and returned to 365 members, when further proceedings were stopped by the institution of suit. This large amount of money was diverted from the trust purposes for which it had been accumulated, and was therefore wasted and misapplied.

*Jurisdiction*: Prior to the Act of 1868, Chap. 471 (Code, Art. 23, Sec. 255, &c.), there had existed in this State a well settled power in courts of equity for the appointment of receivers of corporations in cases proper for that relief.

Hall vs. U. S. Ins. Co., 5 Gill 484, 497.

Ellicott vs. U. S. Ins. Co., 7 Gill 307.

Breach of trust and danger of loss are among the grounds for the exercise of the jurisdiction in cases of corporations.

3 Pom. Eq. Sec. 1334 (10), note 5.

Evans vs. Coventry, 5 D. M. & G. 911.

Stamm vs. Benefit Assn., 65 Mich. 317.

Peltz vs. Financial Union, 19 Atl. Rep. 668.

Direct proceedings for the dissolution of corporations are provided by the Code, but such provisions have not been understood to oust the general equity jurisdiction referred to, and such jurisdiction has been in practice, actually exerted and recognized.

Frank vs. Morrison, 58 Md. 423.

There is an established distinction between the dissolution of a corporation, or the forfeiture of its charter, upon direct statutory proceedings to that end, and the liquidation of the affairs of a corporation, either by voluntary assignment or by the appointment of a receiver.

State vs. Bank, 6 G. & J. 205, 230.
Ordway vs. Bank, 47 Md. 217, 238.
Bank vs. Ins. Co., 104 U. S. 55, 74.
Bank vs. Bank, 14 Wall 383, 398.

In the case of O'Neill vs. Protective Endowment League, in the Circuit Court of Baltimore City, relied on by the defendant, it was conceded that the plaintiff would have been entitled to relief if the elements had existed which have been found in the present case.

The plaintiffs in these consolidated cases are not suing as stockholders or as members of the corporation. As members of the order, a voluntary association outside the pale of the corporation, their status is that of creditors, and not only creditors, but also beneficiaries of a trust.

Misconduct and misapplication upon the part of the trustees, fraud and breaches of trust are charged and proved; the fund is shown to be in danger; the immediate intervention of the court is found to be necessary. To set in motion the machinery provided by the Code for the forfeiture of the charter or for the dissolution of the corporation would involve delay. In the meantime, over nineteen thousand certificate holders are to be called on for further assessments, one of which, in fact, is now pending, and they are also exposed to the danger of further misapplications of the fund.

To withhold relief under these circumstances would be a denial of justice.

An order will be passed for the appointment of receivers in such number, at such rate of compensation and with such security as may, upon further hearing, be deemed suitable, with authority to wind up the affairs of the corporation, in order to make an equitable distribution of its assets amongst the parties entitled.